**Agnes E. POWER, Administratrix,**

**v.**

**UNITED STATES of America.**

**Civ. A. No. 55-965.**

United States District Court
D. Massachusetts.

June 19, 1957

Timothy J. Murphy, Donald Stahl, Boston, Mass., and Frank A. Welch, Newton, Mass., for plaintiff.

Anthony Julian, U. S. Atty., Gael Mahony, Asst. U. S. Atty., Boston, Mass., for defendant.

FORD, District Judge.

1. On June 26, 1951, Philip B. Power was admitted to the Bedford Veterans Administration Hospital as a transfer patient from the Boston State Hospital, where he had been confined as a mental patient for approximately two and a half years under an order of the State Court. After a period of observation by the medical staff, the following diagnosis of Power's condition was made: emotional instability reaction, chronic, severe, manifested by attention-getting behavior, temper tantrums, child-like judgment, inability to stand frustrations, irritability, and refuge in alcohol.

2. The Bedford Veterans Administration Hospital is owned and operated by the United States Government for the purpose of caring for mentally disturbed

persons who qualify for treatment by the Veterans Administration. The hospital plant, including ten buildings in which patients are housed, is located on 354 acres of land in Bedford, Massachusetts, and is capable of accommodating 1803 patients. On June 12, 1954, when Power met his death, the number of patients at the hospital was approximately 1740.

3. The medical staff of the hospital consists of approximately twenty-five doctors, most of whom are psychiatrists. For the past ten years the hospital has been approved for residency training purposes by the American Board of Psychiatry and Neurology.

4. The guard staff at the hospital consists of six men, whose duties include patroling the hospital grounds and adjacent areas, the protection of patients and the protection of hospital property. As a general rule one guard is on duty at a time. If the services of one guard are insufficient for any reason, then one or more extra guards are assigned.

5. The total personnel employed at the hospital, including doctors, nurses, nursing assistants, administrative personnel, guards, engineering personnel and others, number approximately 1030.

6. Paragraph 210, section XX, of Veterans Administration Manual M10-11, entitled "Standard Administrative Procedures for Psychiatric Services in V. A. Hospitals" provides that selected patients may be allowed unattended access to the hospital grounds as a therapeutic measure when, in the opinion of the ward physician and chief of service, it is considered advisable to grant the patient some personal responsibility for his behavior. It is felt that the granting of grounds privileges in selected cases, will have definite therapeutic value in improving the patient's state of mind and, in addition, will enable the hospital authorities to observe what progress, if any, the patient is making towards recovery. Generally there are 300 patients, more or less, who have qualified for grounds privileges and are allowed, therefore, to walk unattended about the hospital grounds during the daylight hours.

7. During the period from his admission to the hospital on June 26, 1951, until November 24, 1953, Power was granted grounds privileges on numerous occasions. However, in each instance the privilege was revoked, after varying periods of good behavior, usually because Power had become intoxicated and, on some occasions, belligerent. On November 25, 1953, because of Power's repeated abuse of privileges, he was transferred to a closed ward and retained there for five months under close supervision. On April 26, 1954, in view of the notable improvement in Power's attitude and conduct during the preceding few weeks, it was decided by the ward physician and chief of service that his privileges should be restored. Accordingly, on that day Power once again was allowed to walk unattended about the hospital grounds, and this privilege was retained until June 12, 1954, the day of his death. Between April 26, 1954, and the day of his death, there is no notation on Power's record of drunkenness or belligerence.

8. On April 13, 1954, Thomas C. McGowan was admitted to the Bedford Veterans Administration Hospital as a voluntary patient, after a six weeks' stay at the Brattleboro Retreat, a private mental hospital in Vermont. The diagnosis of McGowan's condition by the Brattleboro Retreat was as follows: sociopathic personality disturbance; antisocial reaction; alcohol addiction. On April 23, 1954, McGowan was granted grounds privileges, which were continued until the discovery of the death of Philip Power on June 13. On June 2, 1954, the Bedford Hospital made the following diagnosis of McGowan: inadequate personality; competent. This diagnosis was based on observation of McGowan by the Bedford Hospital staff and on the records of the Charlestown Navy Hospital, the McLean Hospital and the Brattleboro Retreat, regarding treatment given McGowan at each of these hospitals. The plaintiff has not adduced evidence from these records that McGowan, prior to the fight which caused Power's death, had

ever engaged in any assaultive or belligerent conduct.

9. During the evening of June 12, 1954, Power, McGowan and a third patient, Russell Riel, were drinking wine in a wooded area on the hospital reservation. For some unexplained reason Power began striking McGowan; McGowan returned the blows; and Power fell to the ground. Sometime later McGowan and Riel returned to their wards, apparently unaware of Power's condition. The following morning, Sunday, June 13, 1954, McGowan and Riel returned to the scene, where they found the dead body of Power. McGowan thereupon reported this discovery and the happenings of the night before to the hospital authorities. On the afternoon of the same day an autopsy was performed, which disclosed that Power had died as a result of epidural hemorrhage following blunt injuries of the head. The autopsy also disclosed that at the time of his death Power was in a state of acute alcoholic intoxication.

Plaintiff's counsel does not contend that the medical staff of the hospital were negligent in allowing Power and McGowan to have grounds privileges. He does contend, however, that there was negligence on the part of the hospital guard.

Conclusions

On the basis of all the plaintiff's evidence I do not find that any of the hospital personnel were negligent. The number of guards was reasonable and there was no negligence involved in the manner in which they supervised the patients granted grounds privileges. Even assuming that there was negligence on the part of the guard, either in not discovering or preventing the drinking party or in not finding the body of Power after the fight was finished, there still has been no showing of any causal relation between such negligence and the death of Power. McGowan, who caused Power's death, had never demonstrated qualities of assaultiveness or belligerence prior to this occurrence. Certainly it was not to be reasonably foreseen that he was the type of patient who would strike another patient and thereby cause serious injury or death and even if it is assumed there was any negligence on the part of the medical staff of the hospital in failing to furnish an adequate number of guards, the intervening act of McGowan broke any chain of causation between any such assumed negligence and the injuries which caused Power's death.

Furthermore, since it was Power who intentionally started the fight, while in a state of intoxication, by striking McGowan, I find and rule that the unlawful conduct of Power was a contributing cause of his death. Patrican v. Garvey, 287 Mass. 62, 190 N.E. 9; McGuire v. Almy, 297 Mass. 323, 8 N.E.2d 760.

Defendant's motion for dismissal and judgment for defendant is allowed. No costs.